Filed 2/2/21

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | F076883 |
| Plaintiff and Respondent, | (Super. Ct. No. BF156917A) |
| v. | |
| DONTRELL COLLINS, | **OPINION** |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Kern County. John W. Lua, Judge.

Kyle Gee, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Catherine Chatman and Nirav K. Desai, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Dontrell Collins drove his car at nearly 100 miles per hour and collided into a vehicle carrying three young women; two of them died. A test of his blood revealed the

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of sections II, III, IV and V of the Discussion.

presence of alcohol and phencyclidine (PCP).  He was convicted of many crimes, including two counts of murder.

On appeal, Collins raises four claims.  One, the trial court erred in denying his motion to challenge the prosecutor's excusal of a black prospective juror during jury selection.  Two, the evidence did not prove murder.  Three, his attorney failed to object to a psychologist's opinion regarding his mental state during the incident.  Four, the court abused its discretion in denying his motion to continue the sentencing hearing.

The first claim is well taken.  It appears the trial court applied the incorrect standard to review the motion challenging the prosecutor's excusal of a black juror.  Our independent review of the record supports a reasonable inference the prosecutor's excusal was improperly motivated.  The remaining issues lack merit.  Accordingly, the judgment is conditionally reversed to resume and conclude the hearing on the motion.

## BACKGROUND

**Charges**

The Kern County District Attorney charged Collins with eight crimes:  Murder (Pen. Code,[1] § 187; counts 1 & 2); gross vehicular manslaughter while intoxicated (§ 191.5; counts 3 & 4); driving while intoxicated and causing injury (Veh. Code, § 23153, subds. (a) & (b); counts 5 & 6); resisting an executive officer (§ 69; count 7); and committing a crime while in custody (§ 653.75; count 8).  The charges included several enhancements:  Personally inflicting great bodily injury (§ 12022.7; counts 5 & 6) and multiple victims in an intoxicated driving case (Veh. Code, § 23558, counts 3, 4, 5 & 6).  It was also alleged Collins had previously served a prison term (§ 667.5, subd. (b)) and suffered prior strike convictions (§§ 667, subds. (b)-(i) & 1170.12, subds. (c)-(j)).

---

[1] Undesignated statutory references are to the Penal Code.

2.

**Trial Evidence**

The evidence established Collins drove his vehicle at an extremely fast speed on a highway with multiple stoplights. California Highway Patrol Officer Boshers first noticed Collins's vehicle and registered it on his radar at 95 miles per hour. Boshers made a "U-turn" to follow the vehicle but was unable to catch up.

Multiple other people witnessed the same. One witness described Collins's vehicle "driving really, really fast." The witness saw Collins swerve and almost lose control. He believed Collins drove through a red light at over 90 miles per hour.

Another witness estimated Collins's vehicle was traveling about 120 miles per hour. The car was moving so fast it was "wobbl[ing] …." The car drove straight through a red light with other vehicles at the intersection.

Yet another person witnessed Collins's vehicle speeding at "about a hundred miles an hour, jump[] up on the center divider, and then c[o]me down off the divider and r[u]n into the back of another car" that was slowing for a red light. The collision "caus[ed] both vehicles to explode," engulfing the rear-ended vehicle in flames. Two young women died in the fire and a third survived but with serious, long-term injuries and anguish.

A roadside investigation near the collision concluded with Collins's arrest. During the investigation, Collins described driving along the road, trying to slow down, engaging the brakes, and colliding with another vehicle from behind. The law enforcement officer conducting the investigation believed Collins had driven under the influence of alcohol (DUI). A preliminary breath test registered at ".11 percent" "breath alcohol content." A later blood test registered a ".071 percent … blood alcohol content" positive for PCP.

Collins was then booked into the local jail. A few hours later, he was involved in a physical altercation with a guard at the jail. A few days later he was interviewed by a law enforcement officer. In response to a question about how "often he drank and drove," he responded, "[T]oo many times."

3.

Collins's girlfriend testified at the trial. She had warned him not to drive "high" on a near daily basis.

An investigator from the Department of Motor Vehicles also testified. The investigator produced four forms Collins had signed in the five years preceding this collision. Each form included a warning about the dangers of drinking and driving. His signature acknowledged he read each warning.

Dr. Michael Musacco, a psychologist, testified about Collins's mental health. He testified Collins suffered from "a persisting substance induced-mental illness." He opined Collins was capable of understanding the nature and quality of his actions and the difference between right and wrong. In response to the prosecutor's questioning, Dr. Musacco agreed Collins knew the nature and quality of his actions and the difference between right and wrong when the collision occurred.

**Verdict and Sentence**

Collins was convicted as charged. He was sentenced to serve 73 years four months to life in prison.

## <u>DISCUSSION</u>

As mentioned, Collins raises four claims on appeal. First, he argues the court erred in denying his *Batson/Wheeler*[2] motion to challenge the prosecutor's excusal of a prospective black juror. Specifically, he claims the court inappropriately hypothesized race-neutral reasons for the excusal and applied the wrong standard of review.

Second, Collins contends the evidence insufficiently proved murder because it failed to prove his subjective awareness of the dangers attending his conduct and his conscious disregard for those dangers. Third, he alleges his attorney was constitutionally ineffective for failing to object to a psychologist's opinion that, at the time of the collision, Collins understood the nature and quality of his actions and the difference

---

[2] *Batson v. Kentucky* (1986) 476 U.S. 79; *People v. Wheeler* (1978) 22 Cal.3d 258.

between right and wrong. Fourth, he believes the court abused its discretion in denying his motion to continue the sentencing hearing because he needed additional time to research a new trial motion and to conclude writing a "sentencing brief …."

We find merit in the first claim. A thorough review of the record reveals the court erred by denying the *Batson/Wheeler* motion. The remaining claims fail. As we shall explain, the proper remedy is to conditionally reverse the judgment with directions to resume the hearing on the *Batson/Wheeler* motion.

## I. The Court Erred In Denying The *Batson/Wheeler* Motion

During jury selection, the jury box was filled with 12 prospective jurors. Six potential alternate jurors were seated outside the box. These 18 jurors were subjected to questioning to determine their fitness to serve as jurors. The remainder of the venire was seated in the courtroom gallery.

After questioning concluded and each party exercised three peremptory strikes, the prosecutor accepted the 12 jurors in the box. At that point, one black juror was seated in the 12-person jury box. The parties each exercised an additional peremptory and a second black juror, Margo S.,[3] moved from an alternate seat into the 12-person jury box. Collins then used a fifth peremptory strike on a different juror and the prosecutor used a fifth peremptory to strike Margo S.. Collins challenged the prosecutor's fifth strike pursuant to *Batson/Wheeler*.

Outside the jury's presence, Collins's attorney explained Margo S. was "obviously an African American woman … which is … Mr. Collins' racial group." The challenge was premised on the fact counsel "didn't hear anything in her comments that would indicate a race-neutral reason for excusing her …."

---

[3] Many of the prospective jurors are identified in the record by their full names. We decline to do so here.

The court responded it must determine if "the excusal led to a reasonable inference of a discriminatory nature and, by virtue of deduction, there was no other reason under which the prospective juror should have been excused or released." The court subsequently denied the motion, finding Collins "failed to demonstrate a prima facie case that would lead one to reasonably believe that the only reason Ms. [S.] was released from this panel is for a discriminatory purpose …."

The court added, "[B]ased on the direct observations that the Court had in having the opportunity to question Ms. [S.], it did appear to the Court that not only based on her profession does she have some understanding of potential evidence that might be presented in this case, even though she can set it aside, but just as importantly, if not more importantly, she herself was prosecuted for petty theft, as she put it, when she was younger, and she also has cousins that have been incarcerated, two in particular, that she shared with us, one being a result of assaulting his or her mother and another for assaultive allegations." "Those … circumstances … certainly would lend itself to excusing Ms. [S.] for reasons other than" discrimination.

The prosecutor agreed with the court and added, "[S]he indicated that one of her relatives … was convicted of charges as a result of an assault that resulted from what she termed a mental breakdown, which is psychologically similar, but not the same situation as the defense is arguing in this case." He also noted that "prospective juror number one [was] also African-American and the People accepted the panel with her on it."

Collins now faults the court for applying the wrong standard to the motion, and for positing its own nondiscriminatory reasons for the prosecutor's challenge. The People urge us to affirm because the trial court applied the right standard or, alternatively, Collins nonetheless failed to raise a prima facie case of discrimination.

We agree with Collins the trial court apparently applied the wrong standard. We also agree with the People we may independently review the record. But our independent

review, contrary to the People's contention, supports a reasonable inference of discrimination.

**A. Additional Background**

Jury selection in this case began with direct questioning to 17 prospective jurors.[4] The remaining prospective jurors from the venire were asked to pay attention to each question and answer so they would be "ready to respond with answers applicable to [the] questions." We detail the voir dire relevant to the *Batson/Wheeler* motion, focusing primarily on the jurors the prosecutor first accepted and Margo S..

The court asked each of the 17 jurors several questions, including whether they personally or a close friend or family member was "charged with or accused of committing a crime …." Juror 4237967's brother was arrested for a crime. The juror formed an opinion about whether the brother was treated fairly or unfairly and could set aside the brother's experience in serving as a juror in this case.

Juror Micheal B. himself was involved with a crime. He answered he was convicted and the case was dismissed. Those answers were not clarified. He never formed an opinion about whether he was treated fairly and could set aside his experience.

Juror Betty B. had two sons with cases involving DUI charges. One of her sons was twice imprisoned. She believed she could set aside their experiences and serve fairly as a juror.

Juror 4301270's stepson was arrested once. Her own son was convicted of a DUI by plea. She formed no opinion on whether they were treated fairly and could set their experiences aside and serve impartially. She would not hold against Collins his exercising his right to a trial instead of pleading guilty.

---

[4] The court intended to begin jury selection with 18 prospective jurors but one of the original 18 jurors was quickly excused because she knew the victims.

Juror 4552487 was previously convicted of a DUI. The juror formed an opinion about whether he or she was treated fairly and could set aside his or her own experience in serving as a juror. The juror would not hold against Collins his exercising his right to a trial.

Juror John V. himself was convicted of DUI by plea. He believed he was treated fairly. His experience would not influence his role as a juror. He would not hold against Collins his exercising his right to a trial.

Juror 4462349's parents were involved with a crime. The juror did not form an opinion about whether his or her parents were treated fairly and could set aside his or her experience and serve fairly as a juror.

The jurors introduced themselves after answering the court's initial inquiries. Juror Brad D. worked for Kern County Behavioral Health and Recovery Services. He had training or experience with detecting or recognizing mental illness. He thought he could set aside his training and rely solely on the evidence in this case.

The prosecutor collectively asked the same 17 jurors if "anybody … had a negative experience with law enforcement?" Only Betty B. replied affirmatively.

The prosecutor then stated he believed "that if you've been charged with a crime or you've been convicted or something that everyone has an opinion whether they've been treated fairly or not …." He followed up by directly asking Juror 4552487 if he or she was treated fairly. The juror responded, "Yes."

After this initial questioning concluded, the parties began exercising peremptory challenges against the jurors seated in the 12-person jury box. The potential alternates, seated outside the box, would take the place of each excused juror so that there were always 12 jurors in the jury box.

Each party exercised three peremptory challenges, reducing the prospective jurors in the box to 11. Each of the above identified and discussed jurors remained among the

11.  Seven more jurors were then seated to fill the prospective panel with 18 total jurors, including Margo S..

Margo S. introduced herself as "a psych tech at the Department of Corrections." The court followed up by asking if she "[w]ould … be able to set aside [her] [professional] training and experience" while serving as a juror in this case.  She twice answered, "Yes."

The court then asked the seven new jurors if they or someone close to them had "ever been charged with or accused of committing a crime …."  Margo S. replied she was "charged with a petty theft when [she] was younger, and [had] a couple of cousins who [were] in prison …."  She explained one of her cousins "attacked his mom" during "a mental breakdown" and the other "had assault charges."  She was not close to her cousins and could set aside her own as well as their experiences in serving as a juror.

In response to Collins's attorney, Margo S. divulged her familiarity with mental health medications.  She added that she would like to correct any evidence during the trial that conflicted with her training but would not do so if that was disallowed.

When the prosecutor resumed questioning, he directly asked two of the seven new jurors if they were treated fairly by law enforcement.[5]  He then collectively asked the others if they had any negative experiences with law enforcement.  Margo S. did not respond.

After the parties concluded their questioning, the prosecutor "accept[ed] the panel as presently constituted."  At that point, the panel consisted of every juror identified above.  Margo S. was in seat 14.

---

[5] Those two jurors had described experiences with law enforcement that are not otherwise relevant.

9.

Collins did not accept the panel and instead excused one juror, followed by the prosecutor responding in kind. Margo S. then moved into seat two. After Collins excused another juror, the prosecutor excused Margo S., prompting the present motion.

### B. Analysis[6]

"The 'Constitution forbids striking even a single prospective juror for a discriminatory purpose.' " (*Foster v. Chatman* (2016) 136 S.Ct. 1737, 1747.) Ruling on a *Batson/Wheeler* motion is a three stage process. In a typical criminal[7] case, " ' "[f]irst, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race[; s]econd, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question[; and t]hird, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination." ' " (*Snyder v. Louisiana* (2008) 552 U.S. 472, 476-477 (*Snyder*).)

---

[6] The Legislature recently enacted legislation to address concerns with the *Batson/Wheeler* framework. It explicitly found "the existing procedure for determining whether a peremptory challenge was exercised on the basis of a legally impermissible reason has failed to eliminate … discrimination. In particular, the Legislature [found] that requiring proof of intentional bias renders the procedure ineffective and that many of the reasons routinely advanced to justify the exclusion of jurors from protected groups are in fact associated with stereotypes about those groups or otherwise based on unlawful discrimination." (Assem. Bill No. 3070 (2019-2020 Reg. Sess.) § 1, subd. (b).) The Legislature "designate[d] several justifications as presumptively invalid and provide[d] a remedy for both conscious and unconscious bias in the use of peremptory challenges." (*Ibid.*)

Presumptively invalid justifications include "[e]xpressing a distrust of or having a negative experience with law enforcement or the criminal legal system" and "[h]aving a close relationship with people who have been stopped, arrested, or convicted of a crime." (Assem. Bill No. 3070 (2019-2020 Reg. Sess.) § 2, subds. (e)(1) & (e)(3).) Neither party notes this legislation and we do not rely on it to decide this appeal. (See *id.*, § 2, subd. (i) [new legislation "applies in all jury trials in which jury selection begins on or after January 1, 2022."].)

[7] The Constitution forbids discriminatory strikes against jurors in all cases, civil and criminal, and applies equally to defendants, plaintiffs, and prosecutors alike.

10.

"A defendant establishes a prima facie case of discrimination 'by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred.' [Citation.] An inference is a logical conclusion based on a set of facts. [Citation.] When the trial court concludes that a defendant has failed to make a prima facie case, we review the voir dire of the challenged jurors to determine whether the totality of the relevant facts supports an inference of discrimination." (*People v. Lancaster* (2007) 41 Cal.4th 50, 74 (*Lancaster*).) An " 'only logical conclusion' standard … overstate[s] the requirement…." (*Id*. at p. 75.)

"[C]ertain types of evidence [are] 'especially relevant,' including: 'whether a party has struck most or all of the members of the venire from an identified group, whether a party has used a disproportionate number of strikes against members of that group, whether the party has engaged those prospective jurors in only desultory voir dire, whether the defendant is a member of that group, and whether the victim is a member of the group to which a majority of remaining jurors belong.' " (*People v. Rhoades* (2019) 8 Cal.5th 393, 429 (*Rhoades*).) "[A]n appellate court may take into account 'nondiscriminatory reasons for a peremptory challenge that are apparent from and "clearly established" in the record [citations] and that necessarily dispel any inference of bias.' " (*Id*. at p. 431.)

 "[A] reviewing court may not rely on a prosecutor's statement of reasons to *support* a trial court's finding that the defendant failed to make out a prima facie case of discrimination. … [T]he fact that the prosecutor volunteered one or more nondiscriminatory reasons for excusing the juror is of no relevance at the first stage." (*People v. Scott* (2015) 61 Cal.4th 363, 390 (*Scott*).)

Nonetheless, "[w]hen discriminatory intent is ' "inherent" ' in the explanation offered by the prosecutor [citation], the public's confidence in the rule of law suffers, regardless of whether the defendant was able to make out a prima facie case of discrimination. In these circumstances, 'justice must satisfy the appearance of justice.'

11.

[Citation.] Reviewing courts, therefore should not blind themselves to the record in the 'rare' circumstance that a prosecutor volunteers a justification that is discriminatory on its face." (*Scott, supra,* 61 Cal.4th at pp. 390-391.)

Comparative juror analysis also aids in "evaluating the prima facie case[,]" particularly when the trial court "has posited possible prosecutorial reasons for" a challenged strike.[8] (*Rhoades, supra,* 8 Cal.5th at p. 432, fn. 17.) "By comparing the excused jurors to those the prosecutor retained on the identified characteristics, we test the hypothesis that these characteristics were distinct enough to account for the challenge and dispel any inference of bias." (*Ibid.*)

Initially, we recognize the trial court apparently applied the wrong standard by applying a "no other reason" or "only reason" standard to the first-stage review. This is no different than a deficient " 'only logical conclusion' " standard. (*Lancaster, supra,* 41 Cal.4th at p. 75.) In this circumstance, we may "review the record to resolve the legal question whether defendant's showing supported an inference that the prosecutor excused a prospective juror for an improper reason." (*Ibid.*)

Here, the trial court's three race-neutral reasons for striking Margo S. are unsupported and contradicted by the record.[9] The first reason, that "based on her profession … she ha[d] some understanding of potential evidence in [the] case," applied

_____

[8] A reviewing court has a "duty to search for constitutional error with painstaking care …." (*Burger v. Kemp* (1987) 483 U.S. 776, 785.) "[T]he purposeful exclusion of identifiable groups from participation on juries undermines public respect for our criminal justice system." (*Scott, supra,* 61 Cal.4th at p. 390.) If evaluating a *Batson/Wheeler* motion involves true consideration of all the circumstances, it would seem necessary to examine highly relevant comparisons among jurors. This is especially so where the prosecutor has proffered justifications for the strike that do not stand up against even a cursory review of the record.

[9] " ' "Review of a trial court's denial of a *Wheeler/Batson* motion is deferential, examining only whether substantial evidence supports its conclusions." ' " (*People v. Mai* (2013) 57 Cal.4th 986, 1048.) "[B]ut that review remains a meaningful one." (*People v. Lenix* (2008) 44 Cal.4th 602, 621.)

12.

equally to Brad D., a juror the prosecutor accepted notwithstanding a professional familiarity with mental illnesses. Brad D., like Margo S., unequivocally stated he could set aside his personal experience and rely instead on the evidence in this case. Indeed, the court immediately recognized she stated she could set aside her professional experience and knowledge. The court then raised, in its own words, the "just as important[] if not more important[]" additional reasons involving prior law enforcement contacts.

But these additional reasons are flatly contradicted by the record. While it is true Margo S. stated she was "charged with a petty theft when [she] was younger," she was never asked how the charges were resolved. She was never asked if she was treated fairly. She was never asked if her experience was negative or positive. And she did not otherwise disclose the answers to those questions. Certainly, her experience did not prevent her from pursuing a career at the Department of Corrections and Rehabilitation.

Most telling, the prosecutor accepted *seven* other jurors with similar law enforcement contacts or experiences, including two jurors who were convicted of DUI, and two whose sons were either convicted of, or at least charged with, DUI. Clearly, the record reveals Margo S.'s prior charge for petty theft had little, if anything, to do with her dismissal.

Similar evidentiary gaps apply to Margo S.'s cousins' experiences. It was neither asked nor disclosed whether those experiences were negative or positive, or whether she believed her cousins were treated fairly. The only other evidence was that Margo S. was *not* close to her cousins. To find any of these experiences with law enforcement important would be tantamount to concluding every contact with law enforcement resulting in arrest, prosecution, or conviction is a negative experience. Such a conclusion, without more, is irrational.

Finally, " '[w]here the facts in the record are objectively contrary to the prosecutor's statements, serious questions about the legitimacy of a prosecutor's reasons

13.

for exercising peremptory challenges are raised.' " (*People v. Arellano* (2016) 245 Cal.App.4th 1139, 1169.)  This is one of those cases.  The prosecutor echoed the court's reasons and added two of his own:  That there was another black juror still on the panel, and Margo S.'s cousin was convicted after "a mental breakdown, which is psychologically similar, but not the same situation as the defense is arguing in this case." Although none of these justifications are facially discriminatory, we cannot blindly ignore reasons that defy logic or support in the record.

As noted, both the court and the prosecutor cited Margo S.'s criminal history, and her cousins' criminal histories, as race-neutral bases for her excusal.  But the prosecutor did not directly ask Margo S. a single meaningful question.  Even though he himself expressed a belief that every person charged with a crime forms an opinion about fair treatment, he still did not ask her about her experience.  Nor did he ask about her cousins, despite later citing those exact experiences as justifications for her excusal.  If these issues "had actually mattered," the prosecutor "probably would have" inquired into them. (*Miller-El v. Dretke* (2005) 545 U.S. 231, 244-246 (*Miller-El*); *People v. Smith* (2018) 4 Cal.5th 1134, 1152 ["an attorney's failure to meaningfully examine a prospective juror about a subject about which the attorney claims to be concerned can constitute evidence of pretext."].)  Indeed, the prosecutor did directly ask other jurors if law enforcement acted fairly in their respective situations.[10]  With this context, the total lack of voir dire on these issues is significant evidence of discrimination.  (*Rhoades, supra,* 8 Cal.5th at p. 429 [desultory questioning is relevant in first-stage analysis]; *People v. Parker* (2017) 2 Cal.5th 1184, 1211-1212 [failing to ask juror " ' "any questions at all" ' " is relevant].)

We do, of course, acknowledge the prosecutor's acceptance of another black juror in this case "lessen[s] the strength of any inference of discrimination that the pattern of

---

[10] Prior to excusing Margo S., the prosecutor had in total directly asked four different jurors if law enforcement acted fairly in their respective circumstances.

14.

the prosecutor's strikes might otherwise imply." (*People v. Reed* (2018) 4 Cal.5th 989, 1000.) But accepting one juror of a particular group does not necessarily mean another juror of the same group was *not* dismissed due to membership in the same group. There could be reasons why one juror appears favorable to the party, while the other juror is nonetheless stricken precisely because of his or her group.

The prosecutor's other stated reason is less than articulate and makes little, if any, sense.[11] Without further elaboration, the premise that knowing a person with a mental health issue who was convicted of a crime and sentenced to prison somehow justifies a peremptory challenge defies logic. It would appear the opposite conclusion is true: A person's personal knowledge that mental health issues do not prevent conviction or imprisonment would seem advantageous to the prosecution in a case involving a mental health defense. In fact, no person would know that better than a "psych tech" at the Department of Corrections and Rehabilitation.

Ultimately, the prosecutor did not ask Margo S. any meaningful questions. The prosecutor directly asked other jurors if they were treated fairly by law enforcement and accepted seven jurors with some connection to criminal charges including two jurors personally convicted of DUI. The court and prosecutor then each cited Margo S.'s unknown criminal history as a race-neutral basis for her excusal.

None of the other reasons hypothesized by the court, or proffered by the prosecutor, find support in either logic or the record. The criminal history justifications

---

[11] "It is true that peremptories are often the subjects of instinct, [citation], and it can sometimes be hard to say what the reason is. But when illegitimate grounds like race are in issue, a prosecutor simply has got to state his reasons as best he can and stand or fall on the plausibility of the reasons he gives." (*Miller-El, supra,* 545 U.S. at p. 252.) It is also true " '[a] reason that makes no sense is nonetheless' " a valid reason as long as it is genuine and nondiscriminatory. (*People v. Stanley* (2004) 39 Cal.4th 913, 936.) But the validity of the prosecutor's justification is not relevant to *defeating* a prima facie case, even though its implausibility may be relevant to *proving* a prima facie case. (*Scott, supra,* 61 Cal.4th at pp. 390-391.)

are contradicted by the record. The disparate treatment between accepted jurors and Margo S. is not obviously explained away by other clearly established reasons in the record. The facts were sufficient to raise a reasonable inference of discrimination. The trial court erred in concluding otherwise.

### C. Remedy

We believe the correct resolution is for the trial court to proceed with the second and third stages upon remand.[12] "The trial court has a pivotal role in evaluating *Batson* claims. Step three of the *Batson* inquiry involves an evaluation of the prosecutor's credibility, [citation], and 'the best evidence [of discriminatory intent] often will be the demeanor of the attorney who exercises the challenge,' [citation]. In addition, race-neutral reasons for peremptory challenges often invoke a juror's demeanor (*e.g.,* nervousness, inattention), making the trial court's firsthand observations of even greater importance. In this situation, the trial court must evaluate not only whether the prosecutor's demeanor belies a discriminatory intent, but also whether the juror's demeanor can credibly be said to have exhibited the basis for the strike attributed to the juror by the prosecutor. We have recognized that these determinations of credibility and demeanor lie ' "peculiarly within a trial judge's province," ' [citation], and we have stated that 'in the absence of exceptional circumstances, we would defer to [the trial court],' [citation.]" (*Snyder, supra,* 552 U.S. at p. 477.)

For these reasons, the trial court "should attempt to conduct the second and third *Batson* steps. It should require the prosecutor to explain his challenges.[13] If the prosecutor offers a race-neutral explanation, the court must try to evaluate that

---

**12** This limited remand is the remedy articulated by Justice Chin in the majority opinion in *People v. Johnson* (2006) 38 Cal.4th 1096, 1101-1104 (*Johnson*), following an extensive review of applicable California and federal decisions. It was recently applied in *Unzueta v. Akopyan* (2019) 42 Cal.App.5th 199, 217-218.

**13** See, e.g., *People v. Tapia* (1994) 25 Cal.App.4th 984, 1031-1032.

explanation and decide whether defendant has proved purposeful racial discrimination. If the court finds that, due to the passage of time or any other reason, it cannot adequately address the issues at this stage or make a reliable determination, or if it determines that the prosecutor exercised his peremptory challenges improperly, it should set the case for a new trial. If it finds the prosecutor exercised his peremptory challenges in a permissible fashion, it should reinstate the judgment."[14] (*Johnson, supra,* 38 Cal.4th at pp. 1103-1104.)

## II. The Evidence Proved Implied Malice Murder

Collins was convicted of two counts of second degree murder. He now argues the evidence did not prove murder because implied malice was not proven. We disagree.

"In reviewing a claim for sufficiency of the evidence, we must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime or special circumstance beyond a reasonable doubt. We review the entire record in the light most favorable to the judgment below to determine whether it discloses sufficient evidence—that is, evidence that is reasonable, credible, and of solid value—supporting the decision, and not whether the evidence proves guilt beyond a reasonable doubt. [Citation.] We neither reweigh the

---

**14** On remand, the trial court should be particularly mindful the prosecutor contemporaneously placed his justifications on the record. In addition, the prosecutor might well take the opportunity to explain why some jurors with characteristics identical to or similar to Margo S. were deemed appropriate, but Margo S. was excused for those exact characteristics, i.e., criminal charges and familiarity with mental health issues. (See *People v. Miles* (2020) 9 Cal.5th 513, 543 [" 'a party legitimately may challenge one prospective juror but not another to whom the same particular concern applies [because] the risk posed by one panelist might be offset by other answers, behavior, attitudes or experiences that make one juror, on balance, more or less desirable.' "].) We simply note the record, including the prosecutor's justifications, does not disclose any concern relating to Margo S.'s attitude, behavior, or ability to answer any questions truthfully and without equivocation. The trial court will need to examine the plausibility and sincerity of the prosecutor's responses, if any.

evidence nor reevaluate the credibility of witnesses. [Citation.] We presume in support of the judgment the existence of every fact the jury reasonably could deduce from the evidence. [Citation.] If the circumstances reasonably justify the findings made by the trier of fact, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*People v. Jennings* (2010) 50 Cal.4th 616, 638-639.)

Second degree murder requires proof of an act, committed with malice aforethought, resulting in death. (§ 187; *People v. Cravens* (2012) 53 Cal.4th 500, 507 (*Cravens*).) Malice aforethought may be express or implied. (*Ibid.*) Implied malice exists when a person performs an act, the natural and probable consequences of which are dangerous to human life, and acts with conscious disregard to that danger. (*People v. Chun* (2009) 45 Cal.4th 1172, 1181.) " '[I]mplied malice [involves] "both a physical and a mental component. The physical component is satisfied by the performance of 'an act, the natural consequences of which are dangerous to life.' [Citation.] The mental component is the requirement that the defendant 'knows that his conduct endangers the life of another and ... acts with conscious disregard for life.' " (*People v. Soto* (2018) 4 Cal.5th 968, 974 (*Soto*).)

Murder based on the act of driving while intoxicated does not require proof "of a 'predicate act,' i.e., a prior DUI or an alcohol-related accident necessary to establish implied malice." (*People v. Johnigan* (2011) 196 Cal.App.4th 1084, 1091 (*Johnigan*).) " '[L]ike all other elements of a crime, implied malice may be proven by circumstantial evidence.' " (*People v. Jimenez* (2015) 242 Cal.App.4th 1337, 1358.)

The record here sufficiently proved implied malice.[15] The physical component of implied malice is not at issue. Suffice it to say, driving a car at speeds near or in excess

---

[15] The act, causation, and death elements of murder are not disputed.

of 100 miles per hour is dangerous to life. The evidence proving the mental component was compelling and sufficient.

Perhaps most importantly, Collins admitted he drove after consuming alcohol "too many times." The jury could reasonably interpret his admission as a confession regarding the dangers of intoxicated driving. "A confession is like no other evidence. Indeed, 'the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him …. [T]he admissions of a defendant come from the actor himself, the most knowledgeable and unimpeachable source of information about his past conduct.' " (*Arizona v. Fulminante* (1991) 499 U.S. 279, 296.)

Beyond Collins's admission, his driving itself exhibited an "actual awareness of the great risk of harm which he had created." (*People v. Watson* (1981) 30 Cal.3d 290, 301 (*Watson*).) Specifically, he drove down the road at extremely high speeds and nearly hit multiple vehicles but swerved to avoid collisions. The jury could reasonably infer his knowledge of dangerous conduct from the fact Collins actively avoided colliding with other vehicles multiple times before striking the victims' vehicle. (*Ibid*.)

Moreover, Collins's girlfriend testified she warned him about the dangers of driving "high" almost every day before the collision. He also signed four DMV forms indicating he had read the attendant warnings regarding intoxicated driving.[16] (See *People v. Wolfe* (2018) 20 Cal.App.5th 673, 683 [signed DMV form relevant to subjective knowledge].)

---

[16] Collins further argues "the truth is that people do not read the reverse sides of such applications, any more than people read the 'terms and conditions' of car rental agreements." But his signature undoubtedly *is* evidence he read the warnings and it is the jury's exclusive prerogative to resolve the facts. The warnings read as follows: "I am advised that being under the influence of alcohol or drugs, or both, impairs the ability to safely operate a motor vehicle. Therefore, it is extremely dangerous to human life to drive while under the influence of alcohol or drugs, or both. If I drive while under the influence of alcohol or drugs, or both, and as a result, a person is killed, I can be charged with murder."

19.

The jury could also readily infer Collins knew he would need to drive after consuming alcohol because he was sober when he drove to the store to purchase the alcohol. (See *Watson, supra,* 30 Cal.3d at p. 300.) "It also may be presumed that [Collins] was aware of the hazards of driving while intoxicated. … 'One who willfully consumes alcoholic beverages to the point of intoxication, knowing that he thereafter must operate a motor vehicle, thereby combining sharply impaired physical and mental faculties with a vehicle capable of great force and speed, reasonably may be held to exhibit a conscious disregard for the safety of others.' " (*Id.* at pp. 300-301; *Johnigan, supra,* 196 Cal.App.4th at p. 1091 [the danger of intoxicated driving is " ' "a very commonly understood risk" ' "].)

We need not, however, indulge in presumptions. Collins consciously disregarded the danger to other lives by traveling at nearly 100 miles per hour while making no attempt to stop at red lights with multiple vehicles along his path. Immediately before crashing, with multiple vehicles either slowing or stopped for a red light in front of him, Collins made no apparent attempt to slow his vehicle. Instead, he swerved onto the center divider attempting to pass the vehicles—as if they were obstacles in his path—and blow through yet another red light. Unfortunately, his attempt failed and he instead struck another vehicle with enough force to ignite it, killing two of its occupants and severely burning the third.

In sum, "Whether [Collins] was subjectively aware of the risk is best answered by the question: how could he not be? It takes no leap of logic for the jury to conclude that because anyone would be aware of the risk, [Collins] was aware of the risk." (*People v. Moore* (2010) 187 Cal.App.4th 937, 941; see *Cravens, supra,* 53 Cal.4th at p. 511 [jury may justifiably infer "defendant's subjective awareness" of dangerous conduct from "the circumstances … alone"].) His conduct in swerving to avoid collisions and *still* subsequently failing to stop—or even slow down—at red lights while driving nearly or

20.

more than 100 miles per hour exhibits a clear conscious disregard for human life. His claim the evidence insufficiently proved murder is meritless.

## III.  Defense Counsel Was Not Ineffective

At trial, Dr. Musacco testified Collins understood the nature and quality of his actions and knew the difference between right and wrong *at the time* of the collision. The prosecutor referenced this testimony multiple times in closing argument.

Collins now faults his attorney for failing to object to the testimony and the prosecutor's corresponding argument. The question squarely presented is whether Dr. Musacco's testimony is equivalent to an opinion Collins possessed the requisite "mental component" of implied malice. (See *Soto, supra,* 4 Cal.5th at p. 974.) We need not, however, answer the question because we conclude a different outcome at trial was not reasonably probable even absent the specific testimony and argument at issue.

### A. Additional Background

A large portion of the trial focused on Collins's mental state while he drove the vehicle that ultimately killed two victims. To that end, Collins sought to introduce evidence he suffered from a mental disease impairing his ability to appreciate or understand the dangerousness of his conduct, and inhibiting his ability to consciously disregard that danger.

To accomplish the goal, Collins introduced portions of his interviews with law enforcement relating he did not remember driving at all. His lack of recollection was attributed to believing he was Jesus which caused tunnel vision, or because something entered his body, forcing him to "gun it" and otherwise black out. The prosecutor introduced other portions of those interviews, including that Collins remembered "put[ting] the pedal to the metal," "trying to make the car fly," and swerving and trying to slow down before crashing.

Collins also introduced evidence of his mental health issues through Dr. Musacco's testimony. Dr. Musacco believed Collins legitimately suffered from a

21.

mental illness especially because the illness was well documented both before and after the collision. For example, Collins was once hospitalized during an episode in which he experienced supernatural visions.

To undercut the force of Dr. Musacco's testimony, the prosecutor pointed out medical doctors had previously advised Collins to quit consuming PCP. The prosecutor also emphasized Dr. Musacco was originally appointed by the court to evaluate Collins's sanity but concluded Collins was sane at the time of the collision. Specifically, Dr. Musacco agreed with the prosecutor that Collins understood the nature and quality of his actions and knew the difference between right and wrong.

In closing argument, the prosecutor argued Collins "appreciated the difference between right and wrong. When he's out there, he knows that it's wrong to drive 95 to 110 miles an hour down a busy street. Oh, he knows it, absolutely. [Dr. Musacco] told you that he appreciated the difference between right and wrong." He continued, "But not just that. He understood the nature and quality of his actions. Another way to put that is he knows the difference between driving 110 miles an hour … and throwing a piece of bubble gum out his window … which is one of the reasons that I think you will find that the mental evidence in this case doesn't really have applicability." The prosecutor then explained mental health evidence was relevant to implied malice but voluntary intoxication was not.

Later, the prosecutor stated any mental health defense was limited by Dr. Musacco's opinion that Collins knew "the difference between right and wrong and … probably more important than that, he understands the nature and quality of his actions. He's aware of that. And there's a whole lot of evidence that suggests that."

The prosecutor then listed the evidence supporting his argument including that Collins's girlfriend, family, and prior doctors had all in various ways advised him to quit using drugs. That "[h]e [had previously] signed four" DMV forms explaining the dangers of intoxicated driving. That he admitted to drinking and driving "[t]oo many"

22.

times.  And that "one of the single best pieces of evidence" was his recorded interview minutes after the collision in which, to quote the prosecutor, Collins remembered "swerving out of the way of a car" and trying "to slow down or … to apply his brakes …."

### B. Analysis

The Sixth Amendment guarantees the " 'right to the effective assistance of counsel.' "  (*Strickland v. Washington* (1984) 466 U.S. 668, 685-686.)  " '[T]o establish a claim of ineffective assistance of counsel, [Collins] bears the burden of demonstrating, first, that counsel's performance was deficient because it "fell below an objective standard of reasonableness [¶] ... under prevailing professional norms."  [Citations.] Unless a defendant establishes the contrary, we shall presume that "counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy."  [Citation.]  If the record "sheds no light on why counsel acted or failed to act in the manner challenged," an appellate claim of ineffective assistance of counsel must be rejected "unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation."  [Citations.]  If a defendant meets the burden of establishing that counsel's performance was deficient, he or she also must show that counsel's deficiencies resulted in prejudice, that is, a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." ' "  (*People v. Bell* (2019) 7 Cal.5th 70, 125.)  " 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' "  (*In re Gay* (2020) 8 Cal.5th 1059, 1086.)

"The object of an ineffectiveness claim is not to grade counsel's performance.  If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice … that course should be followed."  (*In re Cox* (2003) 30 Cal.4th 974, 1019-1020; *People v. Carrasco* (2014) 59 Cal.4th 924, 982.)  We follow that course here.

23.

There are two distinct but related issues we must resolve. First, was Dr. Musacco's testimony admissible and, if not, was defense counsel ineffective for not objecting? Second, did the prosecutor urge the jury to find implied malice based on Dr. Musacco's testimony and, if so, was defense counsel ineffective for not objecting? We conclude any error is harmless on both accounts.

At the outset we note our Supreme Court, in *People v. DeHoyos* concluded an expert's opinion the defendant knew the difference between right and wrong at the time of a murder was irrelevant and inadmissible during a trial's guilt phase. (*People v. DeHoyos* (2013) 57 Cal.4th 79, 118 (*DeHoyos*).) The Court also concluded the testimony was not otherwise inadmissible under sections 28 and 29[17] because it was not "tantamount to stating an opinion that defendant did or did not have the mental state required for the crime charged …." (*DeHoyos,* at p. 121.)

The testimony here is more than that Collins knew the difference between right and wrong—it included the opinion he understood the nature and quality of his actions, i.e., driving a car at a high rate of speed. But the testimony itself, even if inadmissible under sections 28 and 29, was not prejudicial. Collins readily acknowledged he knew he was driving a car at a high rate of speed. Dr. Musacco's opinion added nothing to Collins's admission.

The prosecutor's argument poses a different question. Undoubtedly, the prosecutor referenced Dr. Musacco's irrelevant sanity opinion multiple times in closing argument and obviously linked it to the implied malice mental state element. But the

[17] Sections 28 and 29, provide as relevant: "Evidence of mental disease, mental defect, or mental disorder is admissible solely on the issue of whether or not the accused actually formed a required specific intent, premeditated, deliberated, or harbored malice aforethought, when a specific intent crime is charged." (§ 28, subd. (a).) And, "In the guilt phase of a criminal action, any expert testifying about a defendant's mental illness, mental disorder, or mental defect shall not testify as to whether the defendant had or did not have the required mental states, which include, but are not limited to, purpose, intent, knowledge, or malice aforethought, for the crimes charged." (§ 29.)

prosecutor also closely tied the argument to the actual facts which were highly relevant to proving implied malice, i.e., prior warnings about intoxicated driving and Collins's driving itself exhibiting subjective knowledge regarding dangerous driving.

Significantly, the prosecutor bridged the gap between Dr. Musacco's irrelevant opinion and the evidence by referencing Collins's various admissions including "put[ting] the pedal to the metal," "trying to make the car fly," and trying to avoid a collision by swerving and engaging the brakes. Granted, Collins also made statements he did not remember driving, did not remember any traffic, and did not remember the collision either because he was Jesus or something entered his body and, presumably, took control of the vehicle. But those statements were inconsistent with prior contemporaneous admissions about remembering driving and swerving, and were largely " 'unpersuasive in view of the other evidence, because [they were] "conclusory, self-serving, and not subject to cross-examination." ' " (*People v. Suarez* (2020) 10 Cal.5th 116, 166.)

Critically, there was little to differentiate whether Collins's self-serving statements about Jesus and not remembering driving—if true—were due to a mental illness or instead voluntary intoxication. For these reasons, whether or not the prosecutor's argument was objectionable, Collins has not discharged his burden to show prejudice and our confidence in the outcome is not undermined. The ineffective assistance of counsel claim fails.

## IV. The Court Properly Denied The Motion To Continue Sentencing

The jury returned its verdict on November 16, 2017. A sentencing hearing was set for January 17, 2018. The probation department filed its report and recommended sentence on January 8, 2018.

One day before the sentencing hearing, Collins's counsel filed a written motion to continue the hearing to another date. Counsel sought more time "to address several issues … includ[ing] the possibility of striking the defendant's prior strike conviction,

25.

Penal Code §[]654 issues, and the issue of concurrent versus consecutive sentencing." Counsel also sought additional time "to address the constitutional issues of proportionate sentencing and Eighth Amendment 'gross disproportionality' to sentences for similar conduct." The necessity of additional time was due to reviewing the probation report on January 12. In a sworn declaration attached to the motion, counsel declared, "I have recently (within the past 3 days) learned of information that *may* lead to a basis to file a motion for a new trial. At this point, I am only seeking time so that I have an opportunity to evaluate the information and conduct investigation."

At the sentencing hearing, the court first considered the motion to continue. Collins's counsel explained his request for additional time to pursue a motion for new trial was based upon issuing a subpoena to a local school district for Collins's "records." Counsel offered to make "an ex parte offer of proof …."

The trial court denied the motion "find[ing] that good cause ha[d] not been demonstrated …." Collins's counsel proceeded to argue for concurrent sentences, to dismiss the prior strike enhancement, and that the maximum sentence would violate the Eighth Amendment's grossly disproportionate jurisprudence. The court declined to dismiss the prior strike enhancement, imposed and stayed sentence on some counts, and otherwise pronounced consecutive sentences. The court also found the total sentence did not violate the Eighth Amendment.

On appeal, Collins claims the court abused its discretion in denying the motion to continue both because it failed to listen to an offer of proof regarding the new trial motion and the denial left counsel unprepared for the sentencing hearing. We disagree.

"A continuance in a criminal case may be granted only for good cause. (§ 1050, subd. (e).) Whether good cause exists is a question for the trial court's discretion. [Citation.] The court must consider ' " 'not only the benefit which the moving party anticipates but also the likelihood that such benefit will result, the burden on other witnesses, jurors and the court and, above all, whether substantial justice will be

26.

accomplished or defeated by a granting of the motion.' " ' " (*People v. Doolin* (2009) 45 Cal.4th 390, 450 (*Doolin*).) The trial court may not exercise its discretion "so as to deprive the defendant or his attorney of a reasonable opportunity to prepare." (*People v. Sakarias* (2000) 22 Cal.4th 596, 646.)

"A reviewing court considers the circumstances of each case and the reasons presented for the request to determine whether a trial court's denial of a continuance was so arbitrary as to deny due process. [Citation.] Absent a showing of an abuse of discretion and prejudice, the trial court's denial does not warrant reversal." (*Doolin, supra,* 45 Cal.4th at p. 450.) " '[T]he pertinent inquiry is whether the court's ruling 'falls outside the bounds of reason." ' " (*People v. Perez* (2018) 4 Cal.5th 421, 443.)

The court here was well within the bounds of reason in denying the motion to continue. Collins's counsel was not denied a reasonable opportunity to prepare. This was not a situation in which an attorney unfamiliar with the record and issues is denied the opportunity to prepare. (See, e.g., *People v. Fontana* (1982) 139 Cal.App.3d 326, 332-335.) At the time of sentencing here, counsel had represented Collins for one and a half years.[18] Moreover, counsel could not have been seriously surprised by the recommendation of the maximum sentence in a murder case with multiple victims, especially in a case involving relatively straightforward indeterminate and determinate sentencing principles.[19]

---

[18] Collins's trial counsel began representing him in July 2016.

[19] By relatively straightforward, we mean there was no issue of statutory interpretation involved in pronouncing judgment. Or at least none was presented to the court. (Compare *People v. Henderson* (2020) 54 Cal.App.5th 612, 627, review granted Dec. 23, 2020, S265172 [Three Strikes law requires consecutive sentences for multiple strike offenses committed on the same occasion] with *People v. Marcus* (2020) 45 Cal.App.5th 201, 211 [trial courts retain discretion to sentence multiple strike offenses committed on same occasion concurrently under Three Strikes law].)

For these reasons, even if the court abused its discretion, Collins cannot show prejudice. The court considered each issue his counsel raised prior to pronouncing judgment.

In a similar vein, Collins cannot show prejudice with respect to the new trial motion. A new trial based upon new evidence[20] could only be granted if "the defendant … could not, with reasonable diligence, have discovered and produced [the evidence] at the trial." (§ 1181(8).) Because the subpoenaed documents were his own school records, he necessarily could have "discovered" them before trial.[21] An ex parte offer of proof could not change the law. Accordingly, we reject the claim the trial court erred in denying the motion to continue the sentencing hearing.

## V. The Prior Prison Term Enhancements No Longer Apply

Collins's sentence was enhanced by three years for previously serving a prison term. (§ 667.5, subd. (b).) Senate Bill No. 136 (2019-2020 Reg. Sess., § 1), amended "section 667.5, subdivision (b), to eliminate the … prior prison term enhancement for most prior convictions. [Citation.] An exception, not applicable here, is made for a

---

[20] Although the specific grounds for a new trial were never disclosed, the only logical conclusion is that new evidence was the potential ground. No other ground for a new trial in section 1181 appears viable based on counsel's limited representation that the underlying issue involved subpoenaing school records. We are fully confident counsel's reference in the declaration to "seeking time … to evaluate the information and conduct investigation" meant an investigation of facts, i.e., new evidence.

[21] The same conclusion would remain true even if the records sought would lead to additional evidence or witnesses in Collins's favor. The reasonable diligence standard would apply equally to the records and any derivative evidence. Finding otherwise would require concluding Collins and his counsel were unaware the school records existed or that the event believed to be memorialized was forgotten. Such a conclusion is untenable. Finally, we cannot envision a scenario in which the school records would demonstrate actual innocence to a crime occurring at a time Collins was not in school. (Cf. *People v. Martinez* (1984) 36 Cal.3d 816, 819-825 [appropriate to grant new trial motion where, reasonable diligence notwithstanding, "newly discovered evidence shows the defendant was probably innocent"].)

28.

qualifying prior conviction on a sexually violent offense …. [¶] Because [the amendment] became effective before [Collins's] judgment became final, … the amended law applies to him retroactively." (*People v. Reneaux* (2020) 50 Cal.App.5th 852, 876.) The enhancements in this case are ordered stricken.

## DISPOSITION

The prior prison term enhancements (§ 667.5, subd. (b)) are stricken. The judgment is otherwise conditionally reversed for proceedings consistent with this opinion. Should the trial court ultimately reinstate its pronounced judgment, it is directed to issue an amended abstract of judgment reflecting the stricken enhancements and then forward it to the appropriate authorities.

SNAUFFER, J.

WE CONCUR:

FRANSON, Acting P.J.

MEEHAN, J.